The Lannom Manufacturing Company, Inc. v. Commissioner.
Lannom Mfg. Co. v. Commissioner
Docket Nos. 27669, 32290.
United States Tax Court
1952 Tax Ct. Memo LEXIS 317; 11 T.C.M. (CCH) 162; T.C.M. (RIA) 52043; February 21, 1952
*317 Petitioner is a corporation which has grown from the small beginning of a predecessor in 1912 to a large business with needs for considerable amounts of working capital. During the taxable years, it operated a baseball and softball factory, a tannery, a woolen mill, a shoe factory, and farm; through a wholly-owned subsidiary, it manufactured baseballs and softballs in Puerto Rico; and through stock ownership in varying amounts, it had interests in affiliated companies which manufactured leather gloves. Held, during the taxable years, petitioner's earnings and profits were not permitted to accumulate beyond the reasonable needs of the business; and petitioner was not availed of for the purpose of preventing the imposition of surtax upon its shareholders. Frank J. Albus, Esq., for the petitioner. George E. Gibson, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion In these consolidated cases, respondent determined deficiencies in income taxes as follows: Docket No.
Year
Amount
27669
1946
$138,905.84
32290
1947
78,418.33
The sole issue is whether during the taxable years petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders *318 so as to subject petitioner to the surtax provided for by section 102 of the Internal Revenue Code. Other adjustments made by respondent for the calendar year 1947 have been conceded by petitioner. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. Petitioner is a corporation organized under the laws of Tennessee on August 31, 1931, with its principal place of business at Grinnell, Iowa. Its business activities include the operation of a woolen mill and a tannery and the manufacture and sale of hard and soft baseballs, woolen yarn, leather, and women's sport and play shoes. Its books are kept and income reported on the accrual basis of accounting, and its tax returns filed on a calendar-year basis. For the periods here in question, its income tax returns were filed with the collector of internal revenue at Des Moines, Iowa. The original authorized capital stock of petitioner was 5,000 shares of no-par value common stock which is recorded on the books of the petitioner at a stated value of $10 per share. Of these 5,000 shares, 3,992 were outstanding as of December 31, 1946, as follows: No. of
Name
Shares
G. S. Lannom, Jr.
1,931
S. L. Oldham
11
R. C. Seeland
133
Chas. E. Parish
73
Mrs. M. L. Parish
254
Sharp Lannom, III
391
Sharp Lannom, III, Trustee for G. S.
Lannom, IV
50
Martha Lannom Parish, Trustee for
Martha Louise Parish
50
Martha Lannom Parish, Trustee for
John Lannom Parish
50
Jane Campbell Seeland
468 1/2
Emily Campbell Crouch
468 1/2
Sharp Lannom, III, Trustee for Thomas
William Lannom
50
Sharp Lannom, III, Trustee for William
Kellough Lannom
50
M. R. Campbell, Jr.
10
John P. Ramsey
2
Total
3,992
*319 All of the foregoing shareholders are related to G. S. Lannom, Jr. (hereinafter referred to as Lannom), except S. L. Oldham, R. C. Seeland, Jane Campbell Seeland, Emily Campbell Crouch, M. R. Campbell, Jr., and John P. Ramsey. During 1947, petitioner's corporate charter was amended to increase the authorized capital stock from 5,000 shares of no-par common stock to 75,000 shares. On April 10, 1947, petitioner paid a stock dividend. Each shareholder received 12 additional shares of stock for each share of stock previously held. The sum of $479,040 representing such stock dividend was debited to the earned surplus account and credited to the capital account. Lannom is the president of petitioner and its principal stockholder. He has been president from the time of its incorporation in 1931, and was the founder of a predecessor of petitioner which was incorporated in 1912 to operate a tannery and manufacture horse collars. About two years later it expanded its operations to include the manufacture of harness and saddlery. After the first World War, when business was bad, the company commenced the manufacture of leather sporting goods. It began to manufacture baseballs about 1921. Petitioner *320 manufactures about 18 styles and grades of baseballs and about 23 styles and grades of softballs, which are sold under the trade name "Worth". Its annual production is about 100,000 dozen to 150,000 dozen balls, of which approximately 60 per cent are baseballs and 40 per cent softballs. The baseballs sell at retail from 49 cents to $3 and softballs from 39 cents to $3. Petitioner manufactures no other sporting goods. Petitioner operates a light-leather tannery located at Tullahoma, Tennessee, in which the lighter types of hides are tanned for upper shoe leather, sheep and deer skins for glove leather, horse hides for baseball cover leather, cowhides for softball cover leather, and bull croupons and butts for welting. Raw hides are purchased for cash. Petitioner does not buy hides on futures. The tanning process takes about 60 to 90 days. About 10 per cent of the tanned leather is sold to outsiders; between 40 per cent and 50 per cent is used in the manufacture of baseballs and softballs and shoes; the remainder is used by affiliated companies in the manufacture of gloves. In addition to its leather tannery, petitioner also operates a woolen mill located at Grinnell, Iowa. Wool is *321 purchased for cash from the farmers during April and May and spun into baseball yarn which is shipped to its baseball factory at Tullahoma, Tennessee. On January 29, 1945, petitioner caused the West Indies Manufacturing Company of Mayaguez, Puerto Rico, to be organized under the laws of Puerto Rico with an authorized capital of 2,000 shares of $50 par value common stock. Petitioner subscribed for the entire 2,000 shares paying $10,000 therefor. At the same time, it sold land, building, machinery, and equipment to this company for $65,173.84, for which it took a promissory note. This company manufactures baseballs and softballs, which it sells to petitioner on terms of 30 days net and receives payment from petitioner in accordance with these terms. Petitioner then sells the balls in the United States and carries the accounts receivable until paid. Most of the materials used by the company are purchased from petitioner. Petitioner's shoe factory is located at Grinnell, Iowa. It manufactures women's and girls' sport shoes by two different processes, and sells them to the retail shoe trade. In 1944 petitioner acquired a 480-acre farm located about five and one-half miles from Grinnell, *322 Iowa. Its investment in the farm as of December 31, 1944, was $38,820.51; as of December 31, 1946, the investment was $43,784.14; and as of December 31, 1947, the investment was $46,330.05. No one connected with the petitioner does any entertaining on the farm, lives on the farm, or gets any produce from the farm free of charge. The farm products are sold to local buyers, and the cattle and hogs are sold in a similar manner as those sold by other farmers in the locality. The farm was purchased by petitioner with the intent of operating it at a profit, and it has operated it at a profit for each year since it was acquired. This profit has been reported for income tax purposes. No question has ever been raised by Tennessee regarding the right of petitioner to operate a farm under its charter. In addition, petitioner has investments in the following affiliated companies: Morrison-Shults Manufacturing Company, located at Grinnell, Iowa, manufactures medium priced men's and boys' leather dress gloves. Petitioner owns 1,268 shares of common stock in this corporation out of a total of 2,696 shares outstanding. Petitioner rents a portion of the building owned by this corporation which it uses *323 for office space and the operation of a woolen mill. Petitioner supplies this corporation with all of its domestic leather requirements and all of its tubular linings, which linings constitute 80 per cent of the lining requirements of the corporation. The Craftmore Glove Company, located at Lynchburg, Tennessee, manufactures low priced men's and boys' leather gloves. Petitioner supplies this company with all of its leather and lining requirements. Its stock is owned as follows: Morrison-Shults Manufacturing Com-
pany
188 shares
The Lannom Manufacturing Company,
Inc.
20 shares
F. L. Shults
1 share
K. L. Ewart
1 share
Charles E. Parish
1 share
Total
211 shares
Craig Glove Company, Inc., located at Gloversville, New York, manufactures high grade men's leather dress gloves. During the years in question, petitioner owned 505 out of 677 shares of common stock out-standing. This company uses imported hides, and any leather acquired by it which does not measure up to the standard needed for its gloves is sold to Morrison-Shults Manufacturing Company. Petitioner's sales in dollar volume are about 40 per cent for baseballs and softballs, 40 per cent for shoes, 10 per cent in leather sold to affiliated companies, *324 7 per cent for welting, and 3 per cent to outsiders. Petitioner generally sells its baseballs and softballs through jobbers and distributors. The manufacture and sale of such items is a highly competitive business. Petitioner is the only manufacturer of baseballs in the United States which operates its own tannery and woolen mill. Under normal conditions, petitioner's business is subject to a practice known as "dating." This practice was not in effect during World War II because of credit restrictions; but as soon as the War was over and credit restrictions were removed, the practice of "dating" returned. Under this method, baseballs are billed as of April 1, regardless of the date of shipment. Petitioner begins to manufacture baseballs and softballs on the first of July for use during the following year. They are shipped to jobbers and distributors at the end of the year and are billed to them with an April 1 dating, which entitles the jobbers and distributors to a 2 per cent cash discount if payment is made by April 10, or net, if payment is made by May 1. Because of this practice, baseballs and softballs are carried in petitioner's inventory from July 1 to about the end of the year *325 and from then until April 10 they are carried as accounts receivable. Shipments made after April 1 are not subject to "dating." As a result, petitioner receives the greatest bulk of its cash receipts from April 15 to September 1 of each year. Petitioner's net sales, officers' compensation, net income before taxes, Federal taxes, net income after taxes, and dividends paid for each of the years 1932 through 1947 were as follows: Officers'
Net Income
Federal
Net Income
Calendar
Com-
Before
Income
After
Dividends
Year
Net Sales
pensation
Taxes
Taxes
Taxes
Paid
1932
$ 238,159.55
$ 9,134.67
$ 41,162.04
$ 5,659.79
$ 35,502.25
1933
173,297.57
8,850.00
109,391.89
18,010.97
91,380.92
1934
280,650.66
9,600.00
34,505.18
4,744.46
29,760.72
1935
97,173.29
9,900.00
37,585.95
5,161.61
32,424.34
$ 13,692.00
1936
118,471.88
10,200.00
51,128.07
7,841.26
43,286.81
18,777.00
* 1,000.00
1937
337,279.27
12,950.00
48,470.22
8,398.81
40,071.41
3,981.00
* 19,874.84
1938
335,932.98
10,350.00
49,034.00
9,256.71
39,777.29
1939
440,003.20
11,811.67
18,653.72
2,485.83
16,167.89
1940
486,990.46
17,096.04
(17,138.61)
(17,138.61)
1941
758,348.17
14,946.44
37,940.30
10,650.85
27,289.45
3,992.00
1942
889,907.77
14,952.63
76,490.80
28,640.69
47,850.11
13,972.00
1943
1,287,147.77
14,850.00
204,354.92
118,602.58
85,752.34
23,952.00
1944
1,567,725.15
15,150.00
226,758.41
143,027.80
83,730.61
31,936.00
1945
1,685,070.39
24,296.95
259,185.25
160,148.52
99,036.73
31,936.00
1946
2,453,111.95
27,694.29
688,744.36
259,458.53
429,285.83
39,920.00
1947
2,259,439.75
18,450.00
439,022.88
161,692.96
277,329.92
50,898.00
** 479,040.00 *326 Beginning in 1944, petitioner invested some of its funds in stock in various banks throughout the United States. These investments were made so that cash could be kept on an income-producing basis until the fund's would be needed in the business. These securities were liquid and could be converted into cash immediately. The business had been in receivership three times and in the hands of the banks, and as a result it was desired to keep sufficient cash on hand so that such an occurrence would not happen again. A schedule of petitioner's cash, securities owned (other than securities owned in affiliated corporations), liabilities and earned surplus is as follows: CASH, SECURITIES OWNED (OTHER THAN SECURITIES OWNED IN AFFILIATED CORPORATIONS), LIABILITIES AND EARNED SURPLUS AS OF DECEMBER 31 1932 TO 1950, INCLUSIVE JANUARY 31, 1951 AND FEBRUARY 28, 1951 Securities
Owned, Excluding
Securities of
Date
Cash
Affiliated Co.'s
Liabilities
Earned Surplus
Dec. 31, 1932
$ 2,119.04
$ 27,062.36
$ 32,613.32
Dec. 31, 1933
3,649.02
104,872.93
118,783.32
Dec. 31, 1934
5,857.43
57,197.16
150,525.46
Dec. 31, 1935
6,772.97
45,763.06
172,392.34
Dec. 31, 1936
5,343.96
113,672.05
176,315.40
Dec. 31, 1937
5,805.03
143,320.29
182,245.46
Dec. 31, 1938
3,554.75
198,660.41
223,284.86
Dec. 31, 1939
2,115.15
170,533.33
201,690.80
Dec. 31, 1940
1,687.66
80,343.49
183,483.15
Dec. 31, 1941
6,189.99
142,846.35
224,863.57
Dec. 31, 1942
14,688.38
105,193.82
260,945.50
Dec. 31, 1943
121,317.78
117,230.80
331,040.91
Dec. 31, 1944
56,272.16
$ 98,151.07
206,369.25
377,299.57
Dec. 31, 1945
54,694.76
259,739.49
274,132.70
445,523.45
Dec. 31, 1946
316,355.61
337,689.94
386,995.60
831,658.61
Dec. 31, 1947
193,623.80
278,402.22
353,407.91
559,396.42
Dec. 31, 1948
472,982.59
162,110.53
299,934.15
818,493.51
Dec. 31, 1949
466,766.61
191,404.79
257,303.37
864,701.62
Dec. 31, 1950
315,712.55
195,383.00
495,101.65
937,850.43
Jan. 31, 1951
231,921.58
196,961.55
503,854.65
966,807.89
Feb. 28, 1951
183,219.86
197,068.48
443,611.37
1,034,298.56
*327 In December, 1950, petitioner's cash position was such that it became necessary for it to borrow $100,000 cash. Petitioner deposited its bank stocks as collateral security, and because of the nature of the collateral was able to get a loan at the favorable interest rate of 2 1/2 per cent. At various times it has been necessary for petitioner to extend financial aid to some of its affiliated companies. The Craftmore Glove Company receives payment for its gloves during November and December of each year, and production of gloves by Craftmore is financed by petitioner through sale of leather on credit and cash loans. During the years 1946 and 1947, petitioner had a substantial increase in its volume of business and, correspondingly, a substantial increase in employees. Petitioner does not manufacture the centers for its baseballs, but has them manufactured under contract. In 1945 and 1946, it had considerable trouble in obtaining such centers since the plant which formerly manufactured them burned down. When petitioner could not find a company which would manufacture the centers, it entered into an arrangement with three men from its plant whereby it set them up in business, taught them *328 how to manufacture the centers, and financed their operations. Petitioner advanced loans for this purpose in the amount of $15,000 to $20,000. A strong cash position is advantageous to petitioner's business. Cash is paid for hides and wool. When there is a strong cash position, it is possible to purchase job lots of lower-grade cotton yarn for cheaper grades of baseballs through brokers. Kapok, used in the manufacture of softballs, is purchased for cash in carload lots. The following appears in the minutes of a special meeting of petitioner's board of directors at Grinnell, Iowa, on November 28, 1946: "The President reported to the Board of Directors on the operations of the Company for 1946, indicating a potential profit of approximately $650,000. "He also reported that it was necessary to provide additional warehouseeing space in Tullahoma and that there was available the former USO Building which was being offered under bid contract by the Federal Works Agency with headquarters in Atlanta, Georgia, and he recommended that funds be provided for the purchase and conversion of this building for warehouse purposes. "Due to the rapid expansion of business, additional facilities would *329 be necessary to increase the Woolen Mill output and Mr. Lannom recommended that funds be provided for the erection of a building on the land purchased from the N.C. & St. L. Railway, such a building to provide housing for an enlarged Woolen Mill. "He also reported that steps have been taken to provide for knitting of yarn for lining purposes for the glove companies and that same was now being operated under contract with a firm in Shelbyville, Tenn. He stated that the cost of operating such a knitting plant under contract was sufficiently high to render it advisable that provisions be made for funds to increase these facilities in the proposed Woolen Mill plant. "He stated that the Tennery capacity must be increased to provide upper leather for the shoe division because of the inability of contract tanners to furnish the shoe division's requirements, such requirements having increased steadily during the past years. This would necessitate not only a substantial increase in inventory of hides and chemicals and recommended that substantial additional funds be provided for this increase in tannery operations. "In his report he outlined the necessity during the coming year for carrying *330 Accounts Receivable on a dating basis and that such dating would necessitate an investment in Accounts Receivable of approximately $500,000 whereas during the war period Receivables were not in excess of $200,000. "After considerable discussion and consideration the President's report was accepted and the following Resolution was presented by S. L. Oldham: 'Whereas the Corporation will require funds for the expansion program as outlined in the President's report, be it resolved that a dividend of $3.00 per share be paid the stockholders of the stock of issue and outstanding on the closing of the books on November 15, 1946, out of the current earnings of the Company for the year 1946, said dividend to be paid December 2, 1946.'" Petitioner's balance sheet as of December 31, 1945, 1946, and 1947 is as follows: THE LANNOM MANUFACTURING COMPANY, INC.
BALANCE SHEET
AS OF DECEMBER 31, 1945, TO DECEMBER 31, 1947
ASSETS
Dec. 31, 1945
Dec. 31, 1946
Dec. 31, 1947
Current Assets: Cash
$ 54,694.76
$ 316,355.61
$ 193,623.80
Stocks and Bonds -
U.S. Government Securities
212,000.00
258,000.00
195,000.00
Domestic Corporations
47,739.49
79,689.94
83,402.22
Notes and Accounts Receivable -
Notes Receivable
13,267.08
12,000.00
18,350.00
Accounts Receivable - Customers
22,327.98
199,345.41
140,335.57
Accrued Interest, Advances to Salesmen and
Suppliers, etc.
669.90
4,208.85
5,896.84
36,264.96
215,554.26
164,582.41
Less: Reserve for Bad Debts and Discounts
6,338.82
9,207.89
7,976.18
29,926.14
206,346.37
156,606.23
Inventories
252,544.92
267,464.56
673,800.80
Postwar Refund Bonds
6,101.28
Total Current Assets
603,006.59
1,127,856.48
1,302.433.05
Investments and Advances - Affiliated Companies
178,430.57
214,335.66
202,051.72
Less: Excess of Equity Over Cost of Stock
71,299.38
136,734.68
151,344.21
107,131.19
77,600.98
50,707.51
Plant and Equipment
255,269.12
264,898.55
302,533.79
Less: Reserve for Depreciation
150,656.83
158,957.01
171,123.15
104,612.29
105,941.54
131,410.64
Farm Property and Equipment
43,269.98
43,784.14
46,330.05
Less: Reserve for Depreciation
1,879.65
3,579.62
5,343.56
41,390.33
40,204.52
40,986.49
Prepaid Expenses and Deferred Charges
10,153.15
14,636.64
13,892.59
Advances to Employe
943.55
867,242.10
1,366,240.16
1,539,430.28
LIABILITIES
Current Liabilities: Accounts Payable and Accrued Expenses
266,383.70
369,120.93
339,822.42
Bank Loans
Due to Officer
8,421.67
4,291.49
Deferred License Fees on Leased Machinery
7,749.00
9,453.00
9,294.00
Total Liabilities
274,132.70
386,995.60
353,407.91
Capital Stock
39,920.00
39,920.00
518,960.00
Capital Surplus
107,665.95
107,665.95
107,665.95
Earned Surplus
445,523.45
831,658.61
559,396.42
867,242.10
1,366,240.16
1,539,430.28
*331 Following the meeting on November 28, 1946, in the spring of 1947, petitioner purchased the USO Building in Tullahoma for $9,159, which it uses as a warehouse. In 1944, petitioner purchased a vacant property located in Tullahoma from a railroad company with the intention of building a woolen mill on such property and removing the one which it had in Grinnell to Tullahoma. During the years 1946 and 1947, a mill was not constructed because materials were unobtainable at that time; and since that time, petitioner did not have sufficient funds to erect a factory building on the land. No concrete plans were ever drawn up for such a building, nor was a contractor or architect ever consulted. No new equipment or machinery has been purchased by petitioner since the board of directors' meeting in 1946. Petitioner's method of reporting on a calendar-year basis fails to properly reflect its cash position or its accounts receivable for a whole year's operation. Because of the practice of "dating", petitioner's lowest cash position of any year is March 31, and its cash position on December 31 is not its average or normal one. The following table indicates the accounts receivable position on a monthly *332 basis: CUSTOMERS' ACCOUNTS RECEIVABLE
AS OF THE END OF EACH MONTH DURING THE CALENDAR YEARS
1945 TO 1948, INCLUSIVE
Balance at
End of Month
1945
1946
1947
1948
January
$120,997.61
$170,288.31
$248,473.17
$335,846.63
February
133,949.98
148,998.36
251,422.45
401,603.42
March
136,362.39
141,046.18
230,539.42
295,748.33
April
130,398.94
139,215.75
221,721.88
280,032.33
May
142,754.29
136,334.66
230,176.88
237,283.55
June
117,510.60
156,567.68
217,922.72
163,495.58
July
120,193.06
129,237.33
193,197.92
146,037.65
August
126,456.36
163,937.80
198,931.90
177,314.13
September
125,984.19
159,543.45
154,259.68
146,515.88
October
133,970.92
189,394.08
128,950.96
113,450.90
November
82,945.15
191,181.43
125,493.20
103,726.53
December
22,327.98
199,345.41
140,335.57
284,385.91
On February 28, 1951, customers' accounts receivable of petitioner were $673,288.49. Its inventories on December 31, 1946, were $267,464.56; by December 31, 1947, they had increased to $673,800.80; and for no year thereafter through the year 1950 did its inventories drop below $525,000. Respondent determined that petitioner had section 102 net income for the years 1946 and 1947 in the amounts of $389,365.83 and $226,431.92, respectively. During the years 1946 and 1947, the petitioner's earnings *333 and profits were not permitted to accumulate beyond the reasonable needs of the business, and petitioner was not availed of for the purpose of preventing the imposition of surtax upon its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. Opinion RICE, Judge: The sole question is whether petitioner is subject to surtax for the years 1946 and 1947 under section 102 of the Internal Revenue Code[1] by reason of having been availed of for the purpose of preventing the imposition of surtax upon its stockholders. Such a question is factual, and is determined from all the facts and circumstances of the record. Helvering v. Chicago Stock Yards Co., 318 U.S. 693 (1943); The Whitney Chain & Manufacturing Co., 3 T.C. 1109 (1944), affd., 149 Fed. (2d) 936 (C.A. 2, 1945); Cecil B. DeMille, et al., 31 B.T.A. 1161 (1935), affd., 90 Fed. (2d) 12 (C.A. 9, 1937), cert. den., 302 U.S. 713 (1937). Under section 102 (c) of the Code, [2] *335 it is provided that if earnings or profits are accumulated beyond the reasonable needs of the business, petitioner must prove by a clear preponderance of evidence that such retention was not to avoid surtax upon *334 its shareholders. Petitioner argues that retention of funds during 1946 and 1947 was reasonable for the following business purposes: "(1) To take care of the increase in accounts receivable and the increase in inventories which the petitioner knew would arise after World War II and after the practice of "dating" again returned to its industry. "(2) Because of the growing nature of its business up to 1946 and 1947 and the expansion which it felt was bound to come within the next several years. "(3) Because it must maintain a strong cash position at all times in order to survive. "(4) Because of the condition and age of its plant and machinery which will require replacement in the relatively near future. "(5) Because of its fear of a possible business recession that has always followed a major war prior to World War II. "(6) Because of the highly competitive nature of its baseball and shoe business. "(7) Because it is constantly being called upon to financially assist its affiliated glove companies, which companies obtain their raw material requirements from the *336 petitioner. "(8) To pay Federal income tax of $259,458.53 due on its earnings for the year 1946 and to pay Federal income tax of $161,692.96 due on its earnings for the year 1947. "(9) The petitioner was also within its rights to retain part of its funds for general contingencies that confront every type of operating company." All of these claims shall not be discussed since we feel that petitioner has proved that its earnings and profits were reasonably retained for at least some of the purposes set forth above, and therefore the purpose for retaining such earnings and profits was not to prevent the imposition of surtax upon its shareholders. During World War II, credit restrictions kept accounts receivable small. This was particularly noticeable in a business such as petitioner's where the sale of baseballs and softballs was subject to the practice of "dating." We have discussed this practice fully in our findings of fact and shall not again go into detail. Such practice made it necessary for petitioner to finance a full year's manufacture of baseballs and softballs with the greatest bulk of its cash receipts being received between April 15 and September 1 of each year. In addition, *337 petitioner was the only baseball manufacturer in the United States which operated its own tannery and woolen mill and, therefore, had problems which did not confront its competitors. Cash was paid for hides and wool at the time of their purchase. As a result of the complete manufacturing operations and the "dating" practice, petitioner's outlay for raw materials and for expenses of manufacture would not be returned to it for over a year. In addition, petitioner's directors anticipated a post-war increase in inventories and accounts receivable. Such anticipated increases were borne out by subsequent happenings. By December 31, 1947, petitioner's inventory had increased over $400,000 above that of December 31, 1946, and by February, 1951, customers' accounts receivable of petitioner had increased by about $474,000 over that of December 31, 1946. We have previously held that increases in inventory and accounts receivable especially following the economic conditions of World War II, are important factors to be considered in any section 102 case. The J. L. Goodman Furniture Co., 11 T.C. 530 (1948); Lion Clothing Company, 8 T.C. 1181 (1947). Petitioner's entire history has been one of *338 growth and expansion. Commencing with a predecessor corporation which was engaged in the tanning of leather and manufacture of horse collars in 1912, the business had expanded so that by the taxable years petitioner operated a baseball factory, a tannery, a woolen mill, a shoe factory, and a farm; through a wholly-owned subsidiary, it manufactured baseballs in Puerto Rico; and through stock ownership in varying amounts, it had interests in affiliated companies which manufactured leather gloves. Nor did petitioner's expension stop at this point. The stipulated facts show that in 1949 petitioner invested in a Canadian enterprise to manufacture baseballs and softballs to be sold in Canada. $40,000 was paid for an 80 per cent interest in common and preferred stock of Lannom & Wellinger, Ltd. This latter corporation subscribed and paid for 1,000 shares of stock at $10,000 in Kestock Realty, Ltd. No other stock in Kestock Realty, Ltd., has been issued. Petitioner then advanced $30,000 to Kestock which the latter used in the acquisition of a building, which building is rented to Lannom & Wellinger, Ltd. Petitioner took a mortgage on the building for $30,000 to cover its advances. In William C. DeMille Productions, Inc., 30 B.T.A. 826 (1934), *339 this tribunal said: "* * * It requires no argument to support the premise that the cited sections do not contemplate that a business should remain static; it must be assumed that any business shall have the right to grow. Necessarily incident to the exercise of this right are the making and pursuit of plans both as to organization and as to finances which will permit the accomplishment of the contemplated development." Such a statement is applicable to the instant case where we have a corporation constantly pushing forward and extending its activities, as the evidence submitted has amply indicated. Petitioner's directors were concerned with the possibility of a bad business period following World War II. Over the life of the business, beginning in 1912, there had been three receiverships, and petitioner's directors were anxious to keep petitioner in a sufficiently strong financial position to prevent this from happening again. This Court can not criticize the desire to keep petitioner in a sufficiently sound financial position so that such an occurrence would not be experienced again. See Lion Clothing Company, supra. In addition to financing its own varying enterprises, petitioner *340 was also called upon at times to aid its affiliates. When petitioner organized its subsidiary, the West Indies Manufacturing Company, in Puerto Rico in 1945, it not only paid $10,000 for the capital stock in that corporation but also advanced over $65,000 for land, buildings, machinery, and equipment for which it took a note. In addition, petitioner purchases baseballs manufactured by that corporation on terms of 30 days' net. Petitioner then sells these baseballs in the United States under the "dating" practice and carries them as accounts receivable. Petitioner also sells leather on credit and advances loans to its affiliate, the Craftmore Glove Company, which receives payment for its gloves only during November and December of each year. Through this method, petitioner finances the production of gloves by Craftmore. This is not a case where a corporation failed to pay any dividends to its stockholders. Petitioner's dividend policy has been consistent. In 1946, it paid $39,920 and in 1947, $50,898 as cash dividends. Nor do we have a situation where there are loans outstanding to officers. On the contrary, the stipulation shows that in most years petitioner owed money to its officers *341 or an officer. Petitioner invested in bank stocks beginning in 1944 so that it might have some return on its cash until such cash was needed in the business. Its security investments were kept liquid so that they might be converted into cash at any time. In 1950, such securities were used as collateral when petitioner needed a $100,000 loan; and because of the nature of the collateral, petitioner was able to obtain a favorable interest rate. Because of the foregoing reasons plus all other facts appearing in the record, we hold that petitioner's earnings and profits were not permitted to accumulate beyond the reasonable needs of the business; that the petitioner was not availed of in 1946 or 1947 for the purpose of preventing the imposition of the surtax upon its stockholders; and that respondent erred in the imposition of section 102 surtax on petitioner for the years 1946 and 1947. Decision will be entered under Rule 50. Footnotes
*. Paid in property. ↩
**. Stock dividend.↩
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000 plus. 38 1/2 per centum of the undistributed section 102↩ net income in excess of $100,000. 2. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.